# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**FAISAL ASHRAF, AKA "SAL,"**<br><br>Defendant. | **Case No.: SA CR 13-0088-DOC**<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: LOSS AMOUNT** |

**I. INTRODUCTION**

Sentencing hearings in this case were held on December 14 and 15, 2016; January 31, 2017; February 1, 15, 16, and 17, 2017; March 3, 2017; May 31, 2017; June 1, 13, and 14, 2017; and September 18, 2017. In addition, the parties have submitted supplemental briefing summarizing their arguments and proposing findings of fact and conclusions of law. *See* Defendant's Proposed Findings of Fact and Conclusion of Law ("Def. FFCL") (Dkt. 399); Government's Proposed Findings of Fact and Conclusions of Law ("Gov. FFCL") (Dkt. 410). After considering the parties' briefing and arguments, the Court makes the following findings of fact and conclusions of law.

**Applicable Guideline**

1. At the February 1, 2017 sentencing hearing, the Court held that United States Sentencing Guideline ("U.S.S.G.") § 2B1.1 is the applicable guideline in this case.

2. Defendant Faisal Ashraf ("Ashraf" or "Defendant") argued that although Appendix A to the U.S.S.G. lists 2B1.1 as the appropriate guideline for a violation of 18 U.S.C. § 1030(a)(2), it does not specifically list subsection § 1030(a)(2)(C). Guideline 2B1.1 covers "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments."

3. Defendant has pled guilty to a violation of 18 U.S.C. § 1030(a)(2)(C), which does not require fraud. Thus, Defendant argued that § 2B1.1 is inappropriate for the offense at issue.

4. Defendant argued that because violations of § 1030(a)(2)(C) are misdemeanors, they are much less serious than the other (felony) violations of other § 1030(a)(2) subsections. Thus, Defendant argued that the fact that the Appendix does not specifically discuss § 1030(a)(2)(C) should be read to mean that 2B1.1 does not apply to that subsection. Rather, if the U.S. Sentencing Commission wanted 2B1.1 to apply to this non-fraud misdemeanor, it would have said so.

5. The Court finds that the title of guideline cannot not be dispositive. Further, the Court finds that a violation of §1030(a)(2)(C)—because it requires obtaining information without (or exceeding) authorization—does relate to "other forms of theft" and/or "stolen property," which are also included in the title of this guideline.

6. Most notably, the Application Note to Defendant's preferred guideline, U.S.S.G § 2X5.2, states: "Do not apply this guideline to a Class A misdemeanor that has been specifically referenced in Appendix A to another Chapter Two guideline." Appendix A says that 2B1.1 governs violations of § 1030(a)(2). Subsection § 1030(a)(2)(C) is within § 1030(a)(2). Thus, the plain meaning of the guidelines dictates that the proper guideline for subsection § 1030(a)(2)(C) is 2B1.1.

7. The most logical decision is to apply U.S.S.G. § 2B1.1 and the Court therefore reiterates its holding that § 2B1.1 is the applicable guideline.

### Burden of Proof

8. "It is now settled that when a sentencing factor has an extremely disproportionate impact on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence." *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001).

9. The parties agree that clear and convincing is the appropriate standard for proving the loss amount in this case. *See* Def. FFCL at 8–12; Gov. FFCL at 32; Transcript, Feb. 1, 2017 (Dkt. 349) at 42:22–24.

### Loss Amount

10. This case concerns unauthorized purchases made through a program offered by Hewlett Packard ("HP") called the "Volume Big Deal" ("Big Deal") program, which offered discounts to certain approved HP resellers that were substantially greater than those discounts offered to other HP resellers known as "channel partners." Presentence Report ("PSR") (Dkt. 206) ¶ 14; Plea Agreement ¶ 11.

11. The parties have stipulated that paragraphs 14–20 and 22 of the Presentence Report relate to the three specific counts to which Defendant pled guilty, and are the basis for

the loss amount being sought by the government. *See* Stipulation for Sentencing (Dkt. 264) ¶ 2.

12. The only Guidelines issue for sentencing is the loss amount.

13. The government initially sought, based entirely on HP's internal calculations, an alleged loss of $13,721,414.17 in profit because of discounts received by Defendant. Government's Sentencing Position (Dkt. 238) at 2. The Parole Officer adopted this estimate, which Defendant has not pled to. *See* PSR ¶¶ 22, 33.

14. If the Court adopts HP's loss calculation, under U.S.S.G. 2B1.1(b)(1)(K), Defendant's offense level is increased by twenty points. *See* U.S.S.G. 2B1.1(b)(1)(K) (adding twenty offense levels for loss exceeding $9,500,000 but not greater than $25,000,000); PSR ¶ 33.

15. After an amended calculation presented in court on March 3, 2017, the government is currently seeking a total loss amount of $12,608,393.47. Gov. FFCL at 31. This loss is only for purchases made under the General Electric ("GE") Big Deal letter involving the use of the fake end users "GE IT Logistics" and "GE Sourcing."[1] *Id.* at 30–31.

16. This amount is the total alleged loss for sales made through two HP partners: Netcore and CompuCom. *See* Gov. Exs. A, B; Transcript, March 3, 2017 (Dkt. 367) at 5:11–17:17.

17. The alleged loss amount for sales made through Netcore is reached by subtracting the discounted Big Deal price from what is called the "channel buy price." *See* Gov. Ex. A. The "channel buy price" is the already-discounted wholesale price that HP partners pay for merchandise. As explained in Government Exhibit A, the difference between the channel buy price and the Big Deal discount received on purchases made through Netcore was $1,724,538.84. *Id.*

---

[1] The government has alleged that the Defendant and co-defendant Omar Haseeb were involved in discount fraud involving other Big Deal letters. *See* PSR ¶¶ 15–21. However, the unauthorized use of the GE Big Deal discount is the focus of this sentencing and the only conduct that the government is seeking as relevant conduct under the Guidelines. *See* Gov. FFCL at 4–5.

-4-

18. The alleged loss amount for sales made through CompuCom is reached in the same manner. *See* Gov. Ex. B. As explained in Government Exhibit B, the difference between the channel buy price and the Big Deal discount received on purchases made through CompuCom was $10,883,854.63. *Id.*
19. As the Court has repeatedly noted, it must make "a reasonable estimate of the loss, given the available information." *United States v. Bussell,* 504 F.3d 956, 960 (9th Cir. 2007).
20. Defendant has challenged HP's loss calculations as "entirely speculative[,] overly simplistic and based on faulty assumptions and data." Def. FFCL at 12. Specifically, Defendant suggests a determination of the loss amount requires a determination of whether each transaction would have occurred but for HP's Big Deal discount. *Id.* at 13. Defendant argues that the Court cannot assume that every product at issue would have been sold at the channel price because (1) HP routinely offered customer discounts on the channel price, and (2) HP operates in a highly competitive marketplace. *Id.* at 14–15. Further, testimony at the hearing makes clear that the channel price offered to partners varied over time. Transcript, Feb. 1, 2017 (Dkt. 417) Vol. II at 27:19–28:17.
21. The Court does not assume that every transaction at issue in this case would have occurred but for HP's Big Deal discount program. Rather, the Court finds clear and convincing evidence that Defendant was not entitled to the discount that he received, and that he should have paid at least the channel buy price for the products that he did actually purchase. There is no need to imagine an alternative universe in which Defendant, or other parties, sought to purchase the same products through authorized means. That is simply not what happened.
22. The defendants in *United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010), a discount fraud case, made an argument similar to that made by Defendant here. The *Ali* defendants argued that the stipulated facts did not state that end users who purchased products from the defendants at a discount would have otherwise purchased the products at full price. *Id.* at 1069. The Ninth Circuit found this argument "misplaced," explaining that "[i]t does not matter whether those who purchased lower priced software from Defendants

would have paid the higher price otherwise. Rather, the fact that Defendants acquired the lower priced software when they should have paid the higher price establishes [the victim's] loss." *Id.*

23. Further, after conducting a *de novo* review, the *Ali* court upheld the district court's loss calculation. *See id.* at 1073–74. "The district court relied upon spreadsheets, created by IRS agents, that approximated the difference between the full retail price of the software sold by Defendants and the [discount] price Defendants paid for it." *Id.* at 1073. The spreadsheets were hearsay, but the Ninth Circuit found there were sufficient indicia of reliability for the district court to have relied on them. *Id.* In particular, the Ninth Circuit found that "[t]he spreadsheets contained substantial detail and were reviewed both by the IRS agents (who also sent in sworn affidavits regarding the methodology) and Microsoft consultants who reviewed the information." *Id.*

24. Here, no third party or government agency appears to have reviewed and approved the data underlying HP's loss calculation. However, the government has calculated loss as the difference between the unauthorized discount (the Big Deal discount) and the channel buy price, not the list price as in *Ali*, resulting in a much more conservative alleged loss calculation. In addition, the fact of the matter is that HP did *not* offer Defendant a discount on the channel buy price. Rather, Defendant and his brother went to great lengths to mislead HP, and others, in order to receive unauthorized Big Deal discounts.

25. The Court finds the data underlying Government Exhibits A and B (Government Exhibits E, and F and G, respectively) to be reliable. The underlying spreadsheets contain substantial detail, and have been tailored to reflect only those purchases made through the GE Big Deal letter.

26. To the extent Defendant maintains that there is insufficient evidence that he is connected to all of the purchases made through either Netcore or Compucom, the government has provided clear and convincing evidence that Defendant was involved in the purchases listed in the spreadsheets, submitted as Government Exhibits E, F, and G.

a. For example, Government's Exhibit K demonstrates that Defendant is connected to GE IT Logistics. The Defendant reached out to a real estate company to lease office space in Connecticut in the name of Data Centers of America d/b/a GE IT Logistics. The billing address of GE IT Logistics is listed as 300 Long Beach Blvd. Suit #4, Stratford, CT 06615. This address is listed as the shipping address for purchases made through Netcore, as shown in Government's Exhibit E.

b. Government's Exhibit L is an email from a real estate company to Defendant containing a proposed lease for Data Centers of America for a property located at 4 Corporate Dr., Shelton, CT 06484. Defendant is listed as a contact on the proposed lease. The email shows that Defendant forwarded the email to his brother, co-defendant Omar Haseeb ("Haseeb"). In conjunction with Exhibit K this is clear and convincing evidence connecting Defendant to Data Centers of America, and connecting Data Centers of America to GE IT Logistics. As shown in Government's Exhibits E and G, GE IT Logistics was the end customer on purchases made through both Netcore and Compucom.

c. Government's Exhibit N is an email from co-defendant Haseeb requesting signage for the 4 Corporate Dr. address. In the email, Haseeb states that the mailing address of GE IT Logistics is 2 Corporate Dr. Suite 910, in Shelton, CT. Haseeb requests signage for this property that reads "GE IT Logistics." Once a sketch was sent to him for approval, Haseeb forwarded the sketch to Defendant. Government's Exhibit M shows that 2 Corporate Dr. Suite 648, Shelton, CT 06484 is listed as "GE Company GE Supply." Despite slight discrepancies in these addresses, the Court finds that there is clear and convincing evidence connecting Defendant to the Shelton, CT addresses on Corporate Drive, and connecting those addresses to GE IT Logistics.

d. Government's Exhibit O is a series of emails demonstrating that Defendant was involved in ordering HP product. Page 03728 shows that Defendant ordered through CompuCom, listing "Compucom Order # C0558089" in an email to co-

defendant Haseeb. Page 03742 shows an order receipt from CompuCom sent to a "Santosh Padhiari" at the GE IT Logistics domain name that co-defendant Haseeb registered. The body of the order lists 2 Corporate Dr. Suite 910, Shelton, CT 06484 as the billing address and 555 Lordship Blvd. Suite 12 "Stratford Fairfield," CT 06615 as the shipping address. These two addresses are listed in Government's Exhibits F and G, which detail all of the individual purchases made through Netcore and Compucom. Again, the Court finds this underlying data reliable.

27. Defendant was not entitled to the Big Deal discount at the time of the purchases upon which the charge for which Defendant is being sentenced is based. The Court finds there is clear and convincing evidence of what the channel price was for the purchases at issue in this case. Further, the Court finds that there is no reliable evidence that Defendant would have received a discount on the products ordered through Netcore or CompuCom, or evidence as to what that hypothetical discount would have been.

28. Rather, the Court finds that the government has met its burden of proving the facts underlying the alleged loss amount by clear and convincing evidence.

29. The Court finds that the loss amount in this case is the already-discounted channel buy price, less the unauthorized Big Deal price. Accordingly, the Court finds that the loss amount in this case is $12,608,393.47.

DATED: September 21, 2017

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

-8-